# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# SEATTLE DIVISION

| | |
|---|---|
| CAPITOL PROS, INC., | Case No.: 2:17-cv-01410 |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| VADATA, INC. f/k/a, | |
| AMAZON.COM.VADATA, INC., | |
| Defendant. | |

COMES NOW Plaintiff Capitol Pros, Inc. ("Capitol Pros"), by and through counsel, and by way of Complaint against Defendant VADATA, Inc. seeking damages and states as follows:

## PARTIES, JURISDICTION AND VENUE

1. Plaintiff Capitol Pros is a company with its principal place of business located at 14641 Lee Highway, # 203, Centreville, VA 20121. Ricardo Taboada is the President of Capital Pros and was the main point of contact for Capitol Pros.

2. VADATA, Inc. is a Delaware company authorized to do business in Virginia with its principal place of business in Seattle, Washington. VADATA, Inc. was previously registered and operated in Virginia under the name Amazon.com.vadata, Inc. Upon information and belief, the corporate name was changed to VADATA, Inc. in 2011. VADATA, Inc. ("Amazon") is a division of Amazon.com Inc. serving as a data center for Amazon's operations.

3. This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332 as the amount in controversy is greater than $75,000.00 and there is diversity of citizenship between the parties.

4.  Venue is proper in this Court due to the contractual agreement between the Parties and pursuant to 28 U.S.C. § 1391(b)(1).

## **FACTUAL ALLEGATIONS**

5.  Capitol Pros is a commercial cleaning company which specializes in custom janitorial services, commercial cleaning and residential cleaning services in the Virginia, DC and Maryland area. Capitol Pros has been providing these types of services since 2004.

6.  In 2005, Capitol Pros began its business relationship with Defendant Amazon, through a contract to provide janitorial and other services for its office buildings located in Virginia. From the beginning, Capitol Pros earned the respect and trust of Amazon's managers at the time, Gregory Shelton and David Dubinsky, by providing excellent customer service and performing at a high level.

7.  In 2008, Capitol Pros entered into a master services agreement with Amazon which laid out the general terms of their relationship. Specific work was to be more fully described in work orders issued by Amazon to Capitol Pros, which would were incorporated into the master services agreement. A copy of the Master Services Agreement between Amazon and Capitol Pros (the "MSA") is attached hereto as Exhibit A.

8.  Under the terms of the MSA, Capitol Pros had exclusive control over its employees and had the exclusive right to hire, transfer, promote, discipline, and otherwise manage to its personnel. MSA at ¶ 6.

9.  Additionally, after the initial twelve (12) month term, the MSA automatically renewed on a month-to-month basis "until either party gives at least 60 days prior written notice of termination." *Id*. at ¶ 2.

10. The MSA also provided that Work Orders could be terminated without cause "by giving at least 30 days prior written notice to Contractor." *Id.*

11. Finally, no "modification of the MSA or an Work Order is binding unless it is in writing and signed by Amazon and Contractor." *Id.* at ¶ 9.10.

12. Capitol Pros enjoyed a good working relationship with Mr. Shelton and the Amazon facility managers, which included open communications with them to obtain feedback on the quality of Capitol Pros' work.

13. During its relationship with Amazon, Capitol Pros maintained its high level of performance of its contract work for Amazon, not receiving any specific complaints or concerns about its performance of the contract.

14. In or around July 2011, Ryan Maheepat replaced Gregory Shelton as Capital Pros' main point of contact with Amazon. During all times relevant to this Amended Complaint, Mr. Maheepat was manager of Amazon's Data Implementation Center, IntraOps Americas. Capitol Pros was informed by Mr. Maheepat that he had the authority to and would be making all decisions related to the Capitol Pros's contract with Amazon.

15. At no time did any other representative of Amazon contradict or correct Mr. Maheepat's statements to Capitol Pros regarding the extent of his authority with regards to Capitol Pros's contract.

16. Initially, Capitol Pros enjoyed a cooperative and open relationship with Mr. Maheepat. Mr. Taboada discussed Mr. Mr. Maheepat's expectations of Capitol Pros and Mr. Taboada shared Capitol Pros's knowledge regarding specific services being performed based on its experience working for Amazon for numerous years.

17. Because of Capitol Pros's excellent track record, Amazon had great confidence in Capitol Pros' work and its ability to perform at a high level. In fact, Amazon, through Mr. Maheepat, hired Capitol Pros for additional work beyond its contracts for commercial cleaning and janitorial services. For example, Capitol Pros's scope of work expanded to include contracts for painting of the data centers, installation of carpet, installation of bathroom fixtures, landscaping and cleaning up after special events held at Amazon's facilities.

18. About one month after he became Capitol Pros's main point of contact, Mr. Maheepat asked Mr. Taboada to hire his mother and father because they were moving to the area from New York City and they had experience in the commercial cleaning industry. Mr. Taboada indicated he would think about it.

19. By December 2011, Mr. Taboada had not hired Mr. Maheepat's parents. As a result, Mr. Maheepat demanded that Mr. Taboada hire her parents to work at Capitol Pros and specifically to be assigned to the Amazon contract work. Mr. Maheepat threatened Capitol Pros with the loss of its current contract and future contracts with Amazon if Capitol Pros did not comply with his demands.

20. Rather than lose the Amazon contract, Capitol Pros capitulated to Mr. Maheepat's demand and hired Defendant Joe Maharaj and Soddie Maharaj, who are Mr. Maheepat's parents. Mr. Maheepat told Mr. Taboada to use the last name of "Maharaj" rather than "Maheepat" to conceal their relationship to him. Taboada was also instructed not to mention their relationship to Mr. Maheepat to anyone at Amazon.

21. Defendant Amazon, through its agent, Mr. Maheepat, violated the MSA by forcing Capitol Pros to hire Mr. Maheepat's parents, when it knew Capitol Pro alone had the exclusive right under the MSA to hire and otherwise manage its own workforce.

22. Defendant Amazon, through its agent, Mr. Maheepat, then forced Capitol Pros to hire additional friends of Mr. Maheepat's or risk losing the Amazon contract.

23. The individuals Capital Pros was forced to hire were unproductive and unprofessional. Many of them were poor performers and some did not show up for work at all. However, Mr. Taboada and Capitol Pros were not able to discipline these employees as they would do with employees hired through its usual procedures due to Defendant Amazon's violation of the MSA and its overreaching conduct.

24. There were numerous irregularities associated with the forced hiring of the individuals associated with Mr. Maheepat, including the refusal to sign non-compete and confidentiality agreements and the submission of suspicious W-4s, and the avoidance of Capitol Pros's normal security badging procedure it had used for many years while working with Amazon.

25. Upon information and belief, Amazon, through its agent, was aware of these irregularities in Capitol Pros's normal hiring process and that its actions were contrary to the MSA.

26. In January 2013, Mr. Taboada discovered that Mr. Maheepat's family and friends employed by Capitol Pros were working for Barnard Building Services, Inc. ("BBS"), a competing building maintenance company based in Maryland company. Many of the employees worked for BBS at the same time as they worked for Capitol Pros. Mr. Taboada informed Defendant Amazon of this situation by complaining to Mr. Maheepat. Mr. Maheepat indicated there were no problems with Capitol Pros' employees working at BBS. Further, Mr. Maheepat indicated he was friends with the owner of BBS.

27. BBS was a new corporation, having only been incorporated in March 2012. Upon information and belief, Mr. Maheepat's father and other close friends had been working for BBS since its inception.

28. In or around May 2013, Capitol Pros finalized an amendment to its Work Order with Amazon to add another building to its contract identified as IAD15. Capitol Pros had had numerous communications with Amazon regarding this building and even received the signed amendment to its contract. Capitol Pros was to begin work in IAD15 on July 1, 2013. A copy of the First Amendment to Work Order dated January 1, 2013 ("May Work Order") is attached hereto as Exhibit B.

29. After this contract amendment was executed, Mr. Taboada observed BBS workers working in IAD15. Defendant Amazon had not provided written notice terminating the May Work Order as required by the MSA. Nor was there a written modification of the May Work Order signed by Capitol Pros and Amazon as required by the MSA removing Building IAD15 from Capitol Pros's work areas.

30. Mr. Taboada was informed by Defendant Amazon that it made the decision to give the building to a different global company. The other company awarded the contract was BBS. As a result, Capitol Pros was prevented from performing the work it had contracted with Amazon to perform. Defendant Amazon breached the MSA and the May Work Order.

31. Once BBS began its work on IAD15 in July 2013, the employees Capitol Pros was forced to hire would work for a short period time per day in the buildings that were Capitol Pros' responsibility and spend the remainder of the day in BBS's building, IAD15. This situation led to the appearance that Capitol Pros' quality of work was declining.

32. Due to Amazon's rules and regulations applicable to contractors providing services on-site, Defendant Amazon knew or should have known the identity of the Capitol Pros employees who were also employees of BBS. Furthermore, Amazon knew or should have known these individuals were neglecting their fiduciary duties owed to Capitol Pros in favor of BBS.

6

33. Defendant Amazon facilitated the theft of Capitol Pros's propriety business information by Capitol Pros's employees and the continued neglect of their fiduciary duties owed to Capitol Pros by contracting with BBS and turning a blind eye to the dual employment of certain employees working on-site at Amazon, all of which was designed to injure Capitol Pros without legal justification.

34. In or around the late summer of 2013, Mr. Maheepat's family and friends whom Capitol Pros was forced to hire quit Capitol Pros all within weeks of each other, leaving Capitol Pros short-handed at the time its contract performance was under review with Amazon. This mass resignation was planned by the Defendants to cripple Capitol Pros.

35. Amazon continued its breach of the MSA by making changes to the assignments of Capitol Pros's employees without authorization or approval from Capital Pros. Amazon's wrongful behavior continued when it refused to allow Capitol Pros to reverse the change made.

36. Throughout its 8-year history with Amazon, Capital Pros was never subjected to a vendor performance review. However, in September 2013, Capital Pros was given a Business Review by Amazon. Mr. Maheepat was one of Amazon's representatives involved in the Business Review. This Business Review only came after the damage to Capitol Pros's business operations had been done by the Defendant working in concert with Mr. Maheepat's family and friends as described above.

37. The substance of Amazon's review of Capitol Pros and its performance was generally negative and based upon the poor work of Mr. Maheepat's family and friends which Amazon knew was designed to damage Capitol Pros.

38. Defendant Amazon's review of Capitol Pros was a sham due to its awareness of and its assistance provided to the former Capitol Pros' employees to breach their fiduciary duties

7

owed to Capitol Pros, including by contracting with BBS for services which were to be provided by Capitol Pros pursuant to a valid contract.

39. Following the sham review, Amazon did not reengage Capitol Pros and instead contracted with BBB to provide the services Capitol Pros had been providing for years.

40. All conditions precedent, if any, have been satisfied and this action is timely filed.

### COUNT I
### BREACH OF CONTRACT

41. The Plaintiff restates and incorporates the allegations contained in paragraphs 1 through 40 above as if fully set forth herein.

42. The MSA between Capitol Pros and Amazon was a valid contract into which was incorporated various Work Orders.

43. Under the terms of the MSA, Capitol Pros was an independent contractor and had exclusive authority over its employee relations, including hiring, firing and discipline of its employees. With a very limited exception for safety reasons, Amazon was obligated to refrain from dictating employment decisions for Capitol Pros under the MSA. *See generally* Exhibit A.

44. As detailed above, Defendant Amazon breached the MSA through its repeated and persistent interference with Capitol Pros's management of its employees, including hiring decisions and its ability to hire qualified individuals to perform Capitol Pros's work under the MSA.

45. Additionally, under the May Work Order, Capitol Pros was awarded the contract to clean Building IAD15 and was to begin work in July 2013. *See* Exhibit B.

46. However, Defendant Amazon wrongfully prevented Capitol Pros from performing any work in Building IAD15 despite never having amended the May Work Order or the MSA to remove this scope of work from Capitol Pros's responsibility.

47. Defendant Amazon materially breached the terms of the MSA and the May Work Order. Amazon's breaches have damaged Capitol Pros in amounts to be proven at trial

## COUNT II
## INTENTIONAL INTEREFERENCE WITH
## CONTRACTUAL RELATIONSHIP

48. The Plaintiff restates and incorporates the allegations contained in paragraphs 1 through 40 above as if fully set forth herein.

49. Capitol Pros had a valid contractual relationship with each of its employees whereby each individual would perform the assigned by Capitol Pros to the quality and standards expected of a Capitol Pros's employee. Additionally, Capitol Pros's employees were also required to refrain from working at a competing business and ignoring their duties as a Capitol Pro employee.

50. Defendant Amazon were aware of the existence of these contractual relationships with Capitol Pros and of their importance to Capitol Pros.

51. Defendant Amazon wrongfully interfered with Capitol Pros's relationship with certain of its employees by allowing them to work for BBS as well as Capitol Pros, by threatening Capitol Pros if it attempted to discipline certain employees close to Mr. Maheepat, by re-assigning Capitol Pros's employees without the knowledge or consent of Capitol Pros.

52. As a result of Defendant Amazon's interference, the Capitol Pros employees who were close to Mr. Maheepat were very poor workers, some with high absentee rates. These employees also stole Capitol Pros's trade secrets and used them in their work for BBS, a

9

competitor. Their actions were taken with impunity since Amazon, though Mr. Maheepat, would insulate them from discipline or termination imposed by Capitol Pros.

53. Defendant Amazon's interference was undertaken to damage Capitol Pros in its business reputation and for no lawful purpose.

54. As a result of Defendant Amazon's wrongful interference with Capitol Pros's contractual relationships with certain of its employees, Capitol Pros has been damaged in an amount to be proven at trial.

## COUNT III
## VIOLATION OF CONSUMER PROTECTION ACT

55. The Plaintiff restates and incorporates the allegations contained in paragraphs 1 through 40 above as if fully set forth herein

56. The Consumer Protection Act ("CPA"), RCW Chapter 19.86, *et seq.*, is designed to protect the public and foster fair and honest competition.

57. Plaintiff Capitol Pros is a person who was injured in its business by the unfair and wrongful practices of Amazon in the conduct of its business.

58. Defendant Amazon was engaged in trade or commerce within the meaning of the CPA relating the offering of the MSA and Work Orders to Capitol Pros.

59. In violation of the CPA, Defendant Amazon engaged in unfair acts and practices in connection with its business dealings with Capitol Pros as described herein.

60. Defendant Amazon engaged in the above-described unfair acts and practices in connection with its business.

61. Throughout Defendant Amazon's business relationship with Capitol Pros, Amazon held a much greater bargaining position than Capitol Pros.

62. Because of its financial strength and position as a very powerful business, Defendant Amazon is in the position to continue its unfair acts and practices in its business dealings with other small local businesses including business located in Washington.

63. The conduct of Defendant Amazon violated the CPA and was in willful, wanton and reckless disregard of Plaintiff Capitol Pros's rights.

64. As a direct and proximate result of the acts and omissions of Defendant Amazon in violation of CPA, Plaintiff Capitol Pros has suffered and will continue to suffer actual damages.

65. Plaintiff Capitol Pros has been forced to hire the undersigned law firm and has promised to pay it a reasonable fee for bringing this action for which Defendant Amazon will be liable pursuant to CPA.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Capitol Pros, Inc. asks this Honorable Court for an award against the Defendant Amazon as follows:

1. On all Counts asserted above, enter judgment against Defendant Amazon and in favor of Capitol Pros, Inc. for its actual damages in an amount to be determined at trial;

2. Award Capitol Pros, Inc. treble its actual damages awarded for Count II under RCW § 19.86.090;

3. Award pre-judgment interest and the costs of suit, including reasonable attorneys' fees under RCW § 19.86.090; and

4. Award any and all other appropriate relief.

RESPECTFULLY SUBMITTED this 18 day of September, 2017.

*s/ Philip C. Hunsucker*, WSBA No. 48692

HUNSUCKER GOODSTEIN PC
801 Second Avenue, Suite 800
Seattle, WA 98104
T: 206.489.5621
F: 206.260.3400
E-mail: Phunsucker@hgnlaw.com

Neil L. Henrichsen (*Pro Hac Vice admission pending*)
Helen H. Albee (*Pro Hac Vice admission pending*)
HENRICHSEN SIEGEL, P.L.L.C.
301 W. Bay St., 14th Floor
Jacksonville, FL 32202
T: 904.381.8183
F : 904.212.2800
E-mail: Nhenrichsen@hslawyers.com
          Halbee@hslawyers.com

*Attorneys for Plaintiff Capitol Pros, Inc.*